**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Respondent, | ) ) ) | |
| v. | ) ) | Case No. 17 C 1348 |
| JONATHAN TANKSON, | ) ) | |
| Movant. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Jonathan Tankson pled guilty to charges of conspiracy to possess marijuana with the intent to distribute and conspiracy to commit money laundering. *See United States v. Tankson*, No. 1:14-cr-16 (N.D. Ill.). The Court sentenced Tankson to ninety-six months in prison followed by three years of supervised release. Tankson now challenges the voluntariness of his guilty plea and moves to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the Court denies Tankson's motion.

**Background**

**1. Criminal proceedings**

On January 23, 2014, Tankson was arrested by officers of the Bureau of Alcohol, Tobacco, Firearms, and Explosives for his participation in a drug trafficking operation. He was indicted on six federal charges: 1) conspiracy to possess a controlled substance with intent to distribute marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C); 2) possession with intent to distribute a controlled substance in

violation of 21 U.S.C. § 846; 3) conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i); 4) money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and 5 and 6) money laundering in violation of 18 U.S.C. § 1957.

At some point before June 2, 2016, the government and Tankson negotiated and agreed upon a plea agreement. Tankson agreed to plead guilty to counts 1 and 3 in exchange for the government dismissing the other charges against him. *See* Case No. 1:14-cr-16, dkt. 142 (Plea Agreement) ¶ 14. Tankson signed the agreement on June 2, 2016. It stated that he had "read the charges against him" and that the charges had been "fully explained to him by his attorney." *Id.* ¶¶ 3-4. He admitted to facts sufficient to establish his guilt beyond a reasonable doubt. *Id.* ¶ 6. Tankson also represented that he agreed to plead guilty voluntarily and that he understood that by "pleading guilty he surrender[ed] certain rights," including the right to a trial. *Id.* ¶¶ 21-22.

On June 2, 2016, the Court held a guilty plea hearing. At the hearing, and before accepting Tankson's guilty plea, the Court questioned Tankson under oath. The Court explained to Tankson that this was necessary to ensure, among other things, that he was competent, he entered into the agreement voluntarily, he had the assistance of an attorney, and he understood the nature of the charges against him, the possible penalties on those charges, and the rights he was giving up in pleading guilty to those charges. The Court asked Tankson, among other things, if he was pleading guilty of his own free will, if he had enough time to confer to his attorneys about his decision to plead guilty, and if he understood everything in plea agreement. Tankson answered in the affirmative to all of these questions. The Court also specifically asked Tankson's attorney and the prosecutor whether they had any reason to question Tankson's

competency. Both of them said, "no."

On August 30, 2016, the Court sentenced Tankson to ninety-six months in prison on each of the two counts to which he had pled guilty, to be served concurrently, followed by three years of supervised release. The Court dismissed counts two, four, five, and six on the government's motion.

Tankson was ordered to self-surrender to the designated prison by November 10, 2016. He moved to extend his surrender date on five separate occasions. The second of these motions, filed on November 30, 2016, stated that on November 23, Tankson and his uncle, Steve Madondo, had visited counsel and that "Mr. Madondo indicated that Mr. Tankson was suffering some sort of psychiatric issues and provided information about previous psychiatric problems that had never before been provided to [counsel]. Mr. [Madondo] indicated that Mr. Tankson was going to be seeking medical attention." Case No. 1:14-cr-16, dkt. 216 at 1. On November 25, counsel reported, Tankson had been voluntarily admitted to a psychiatric facility. The Court delayed Tankson's surrender date on four occasions to permit him to complete that treatment but ultimately, on January 18, 2017, stated that it would not entertain further requests to delay the start of Tankson's incarceration. Tankson filed a fifth motion to delay his surrender date on February 16, 2017, citing the anticipated filing of a *coram nobis* petition, but the Court denied the motion. Tankson surrendered on February 22, 2017 to begin serving his sentence.

**2.     Tankson's voluntary admission to Hartgrove Hospital**

On November 25, 2016, six days before his extended surrender date of December 1, 2016, Tankson voluntarily admitted himself to Hartgrove Hospital, which

3

focuses on the treatment of mental health issues. Tankson signed a consent form in which he represented that "I, Jonathan Tankson, age 33, can legally consent to all assessment evaluation [sic] for myself." Case No. 1:14-cr-16, dkt. 216-1 at 1. Tankson certified that "I have read and fully understand the above consent for assessment and/or medical screening and I agree to absolve Hartgrove Hospital and its staff rendering the treatment(s) from any liability." *Id.* An emergency services counselor attested, "I certify that [Tankson] has been examined and is considered clinically suitable for voluntary admission." *Id.* at 4.

Once admitted, Tankson was examined by Dr. Martins Adeoye, who prescribed medication to treat anxiety and depression. Dr. Adeoye also referred Tankson for a psychological evaluation in order to "rule-out psychosis, a mood disorder, bipolar disorder, and posttraumatic stress disorder (PTSD)." Case No. 1:14-cr-16, dkt. 240-1 at 1. Dr. Adeoye did not make a request for cognitive testing of Tankson. *Id.*

Tankson was examined by Roni Kholomyansky, M.A., who was supervised by a psychologist, Frank A. Rowe, Ph.D. Dr. Rowe signed the report that Kholomyansky had prepared, so the Court will refer to it as Dr. Rowe's report. Dr. Rowe reported that Tankson's mental status exam revealed that he was "oriented to person, place, time, and situation [and] his delayed memory recall was not impaired." *Id.* at 4. In the report, Dr. Rowe stated that Tankson "did not appear to have any difficulties with task comprehension[, and] [h]is thought processes appeared logical and his thought content was appropriate to the questions that were asked of him." *Id.* Dr. Rowe further stated that although Tankson "frequently expressed frustration and paranoia about the purpose" of one of the psychologic tests administered to him, he "displayed logical

4

thought processes and did not exhibit any bizarre thought content" during the testing. *Id.* at 5.

Based on his examination and Tankson's medical history, Dr. Rowe diagnosed Tankson with major depressive disorder, recurrent, moderate, and with anxious distress; post-traumatic stress disorder (PTSD); mild cannabis use disorder; and mild opioid use disorder. *Id.* at 6-7. With regard to PTSD, Dr. Rowe reported that Tankson "exhibit[ed] the criteria of experiencing traumatic events, flashbacks about these traumatic events, avoidance behaviors, hypervigilance and accompanying hyperarousal, and frequent paranoid ideation." *Id.* Dr. Rowe also reported that, with regard to major depressive disorder, Tankson "me[t] the depressive criteria of depressed mood, sleep disturbances, anhedonia, occasional feelings of guilt and worthlessness, fatigue, psychomotor retardation, and concentration difficulties." *Id.* at 7. Dr. Rowe also stated that Tankson "exhibit[ed] anxiety symptoms of excess worry, feelings of restlessness, and symptoms that resemble a panic attack that occur when he is angry." *Id.* Dr. Rowe recommended that Tankson continue taking medication for anxiety and depression and begin therapy. *Id.* Dr. Adeoye discharged Tankson from Hartgrove Hospital after a four-day stay, on November 29, 2016.

About a week later, on December 5, 2016, Tankson enrolled in Hartgrove Hospital's intensive outpatient program for continued treatment. A licensed professional counselor wrote that Tankson was referred to the program after being diagnosed as having major depressive disorder. Case No. 1:14-cr-16, dkt. 226-1 at 1. The counselor reported that "[Tankson's] treatment [would] include group therapy, individual therapy and medication management as needed, focusing on emotional wellbeing, developing

5

appropriate coping skills and substance abuse." *Id.*

On February 26, 2017, at the request of Tankson's attorneys, Dr. Adeoye wrote a letter describing Tankson's mental status. Case No. 1:17-cv-1348, dkt. 8. Tankson's attorneys asked Dr. Adeoye to answer the following question: "Unmedicated and untreated, would the combination of [Tankson's] PTSD and [major depressive disorder] create a situation where he could not knowingly and voluntarily make a decision about something like whether or not to plead guilty in his criminal case?" *Id.* at 1. Dr. Adeoye responded as follows:

> After many years of periodic acute and chronic traumatic experiences it is well established that brain structures and autonomic responses would have adapted to a heightened survival response. His confirmed diagnoses of PTSD and [major depressive disorder] which was not diagnosed, medicated or treated at the time of his arrest coupled with his limited educational and legal awareness would have created an amalgamation of poor choices and responses during his arrest. It is likely that his survival roto [sic] mode would have been to quickly design ways to get through the ordeal and do what he was being told to do without full understanding of the legal implications or ramifications. He could not have knowingly or voluntarily make rational decisions and his capacity to make rational decisions during his arrest and subsequent guilty plea would have been greatly compromised and diminished.

*Id.* at 2.

### 3. Motion to vacate sentence

On February 16, 2017, Tankson filed in his criminal case a petition for a writ of *coram nobis* under 28 U.S.C. § 1651, contending that he did not plead guilty voluntarily. Four days later, Tankson filed a motion asking the Court to treat his petition for *coram nobis* as a motion to vacate his conviction under 28 U.S.C. § 2255. The Court grants this request and addresses Tankson's motion as a motion under section 28 U.S.C. § 2255.

6

**Discussion**

Section 2255 permits a prisoner to move to vacate his conviction or sentence if he can prove that the judgment was "imposed in violation of the Constitution." 28 U.S.C. § 2255(a). A court must hold an evidentiary hearing to address a section 2255 motion unless the "records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Relief under section 2255 "is appropriate only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (internal quotation marks omitted).

Tankson argues that due process requires vacating his guilty plea and sentence. He contends that he did not realize at the time he pled guilty that he was suffering from psychological conditions that impaired his reasoning ability. He maintains that had he known that he suffered from PTSD and major depressive disorder, he would have sought and undergone a competency evaluation before entering into a plea agreement and pleading guilty. Tankson contends that had he been appropriately diagnosed and medicated, as he is now, he would not have pled guilty—though he has offered no affidavit attesting to this. He argues that his guilty plea was involuntary in light of his undiagnosed mental condition.

The government's response assumes that Tankson is asserting a claim of ineffective assistance of counsel—specifically, that his trial counsel was ineffective in failing to recognize his impairment and request a competency determination before his guilty plea or sentencing. That is not a fair reading of Tankson's motion, which gives no hint of an ineffective assistance claim (Tankson confirms in his reply that he is making

7

no such claim). Rather, Tankson is collaterally attacking his guilty plea by citing newly-discovered evidence that he says shows he did not plead guilty voluntarily as the result of a mental disorder.

Before accepting Tankson's guilty plea, the Court found him competent and also found that he had acted voluntarily. And there is no contention that, prior to the plea or even prior to sentencing, there was anything that ought to have put the Court (or any other participant in the process) on notice of an issue regarding Tankson's competency, his ability to act voluntarily, or the voluntariness of his guilty plea. Given the Court's express competency and voluntariness findings and Tankson's guilty plea, there is arguably a threshold question regarding whether he may collaterally attack the plea on the basis of involuntariness or incompetency via a section 2255 motion. *See generally McMann v. Richardson*, 397 U.S. 750 (1970); *Brady v. United States*, 397 U.S. 742 (1970) (both discussing the question of collateral attacks on guilty pleas). The government, however, has forfeited any such contention by failing to argue it. The Court therefore proceeds to address the merits of Tankson's section 2255 motion.

A defendant who pleads guilty waives a number of constitutional rights, including his right to trial by jury, his right to confront his accusers, and his privilege against compelled self-incrimination. In order for this waiver to be valid, due process requires it to be "an intentional relinquishment or abandonment of a known right or privilege." *McCarthy v. United States*, 394 U.S. 459, 466 (1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The defendant's plea must be voluntarily and knowing, and "it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *Id.*; *see also Parke v. Raley*, 506 U.S. 20, 29 (1992). The

8

defendant "must have full awareness of the plea's direct consequences, real notice of the true nature of the charge against him, and [an] understand[ing] [of] the law in relation to the facts." *Virsnieks v. Smith*, 521 F.3d 707, 714 (7th Cir. 2008) (internal quotation marks and citations omitted). This is determined from "all of the relevant circumstances surrounding [the plea]." *Brady*, 397 U.S. at 749.

In addition, due process requires a "criminal defendant [to] be mentally competent at the time he enters a guilty plea." *United States v. Stoller*, 827 F.3d 591, 595 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1093 (2017). A defendant is competent if "he has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and if he has a rational as well as factual understanding of the proceedings against him." *Id.* at 595-96 (internal quotation marks omitted).

In the present context—specifically, collateral review of a guilty plea after a finding of competence and voluntariness—the defendant bears the burden of proving that the plea he entered was not voluntary and intelligent. *Virsnieks*, 521 F.3d at 714. The Court concludes that the same is true with respect to incompetence: to the extent he is arguing that he was incompetent to plead guilty, Tankson bears the burden of showing that.

First, the Court did not err in finding Tankson competent at the time of his guilty plea without holding a competency hearing. "Failing to *sua sponte* hold a competency hearing violates due process if, but only if, there is a bona fide doubt that arises as to a defendant's competency before trial." *Stoller*, 827 F.3d at 596 (internal quotation marks omitted). A court "uses an objective test to determine whether a reasonable doubt was raised." *United States v. Woodard*, 744 F.3d 488, 493 (7th Cir. 2014). Here there was

9

no doubt. Tankson stated under oath that he had never been diagnosed with or treated for any mental disease or disorder. Both Tankson's attorney, who had represented him for months, and the prosecutor, who had interacted with and observed Tankson during proffer sessions, said they had no reason to believe he was incompetent. And the Court also relied on its own interaction with and observation of Tankson throughout the proceedings. There was nothing that hinted of any issue regarding his ability to consult with his counsel and understand the proceedings.

Second, the evidence affirmatively shows not only that Tankson was competent but also that he pled guilty knowingly and intelligently. At the plea hearing, Tankson stated the following under oath:

- He had never been under the care of treatment of a psychologist of psychiatrist.
- No doctor, psychiatrist or psychologist had ever told him that he had a mental disease or disorder.
- He had never been in counseling or treatment for a drug or alcohol problem and had no medications, drugs, narcotics, or alcohol within the previous day.
- He had sufficient time to confer with counsel regarding his decision to plead guilty, and they answered all of his questions.
- He had no problems with the quality of his legal representation.
- He was satisfied with the advice his attorneys had given him.
- He had read the plea agreement in its entirety before signing it, and his lawyers had explained it to him in full.
- He understood everything in the plea agreement.
- No promises were made to him to plead guilty other than the

agreements set out in writing in the plea agreement.

- No one had tried to pressure or coerce him to plead guilty.
- He was pleading guilty of his own free will.
- He understood the charges and what the government would have to prove to conflict him (elements that the Court spelled out in detail).
- He understood the possible penalties for the crimes to which he was pleading guilty.
- He understood the sentencing process, which the Court described in detail.
- He understood each and every one of the rights he would be giving up by pleading guilty. These included his right to plead not guilty, his right to a trial, his right to call witnesses and cross-examine the prosecution's witnesses, his right to testify or choose not to testify, the presumption of innocence, the need for the government to prove his guilt beyond a reasonable doubt, and so on.
- He agreed with the detailed facts recited by the prosecutor that established his guilt.

Based on Tankson's sworn statements and his admissions at the guilty plea hearing, the Court found that he was competent, aware of the nature of the charges, the consequences of his guilty plea, and the rights he was giving up, and concluded that the plea was knowing and voluntary. These findings were and remain correct. The Court was entitled to rely on Tankson's statements under oath at the guilty plea hearing, and he cannot simply cast them aside now—including his sworn statements regarding his understanding of what he was doing and the consequences of his actions. *See, e.g., United States v. Collins*, 796 F.3d 829, 834 (7th Cir. 2015).

Tankson has not offered evidence sufficient to show that he was incompetent or that he acted anything other than knowingly and intelligently in pleading guilty. In addition to his sworn statements at the plea hearing, other evidence cited by the government or that is otherwise a matter of record likewise establishes his competence and the voluntariness of his guilty plea. This includes:

- Tankson ran a drug trafficking operation for a three-year period.

- He engaged in sophisticated efforts to conceal and launder the proceeds of his illegal drug trafficking. These included the rental of luxury real estate and the purchase of expensive vehicles and involved working with and recruiting others to assist him.

- He gave a detailed and lengthy post-arrest statement.

- He continued to attempt to conceal assets after his arrest, again working with and recruiting others to assist him.

- He participated in proffer interview sessions with prosecutors and law enforcement.

- He dealt on repeated occasions with pretrial services officers, including a number of visits to his home.

- No pretrial service officer ever caught a whiff of incompetency or mental illness. The only red flag involved a mild dependency on marijuana and cough syrup.

- Tankson also appeared in court on a number of occasions; he exhibited no unusual behavior and never indicated any inability to comprehend.

In addition, the probation officer who prepared the presentence report in Tankson's case conducted a wide-ranging interview of him in mid-June 2016. Tankson

provided extensive information regarding his and his family's background, which is set out in detail in the presentence report. Tankson's mother Lori Huff—with whom he was living at the time of the report's preparation—also provided detailed information about him. She speculated that Tankson may have suffered from undiagnosed attention deficit disorder as a child but did not indicate that he had been diagnosed with or treated for this. For his part, Tankson reported that he was in good physical health (a statement his mother corroborated) and was not being treated for any medical conditions. Tankson also reported the following regarding his mental and emotional health:

> Defendant Tankson reported he has never been diagnosed with, or treated for, a mental or emotional problem. He further noted he has never considered seeking mental health treatment or counseling and does not require any such treatment at this time. Ms. Huff indicated that the defendant does not suffer from any mental or emotional problems. The defendant reported he has never experienced any suicidal or homicidal ideation or intent. He also advised he has never experienced any hallucinations or significant depression, or been exposed to any traumatic events. The defendant reported he has been feeling sad and somewhat depressed since his arrest for the instant offense. He noted he is "trying to get through it." He related no changes to his appetite or sleep patterns since his arrest for the instant offense. According to the defendant, no one in his family, of which he is aware, suffers from a mental illness. Ms. Huff advised there is a history of bipolar disorder on her side of the family.

Case No. 1:14-cr-16-1, dkt. 157 (Presentence Report) ¶ 130. To summarize, Tankson reported no history of mental or emotional disorders and stated that he had never experienced any significant depression or been exposed to any traumatic events. Instead, he reported only "feeling sad and somewhat depressed" since his arrest, a condition that the Court can attest (from its experience both before and since serving as a judge) is quite common and unremarkable for a person facing criminal charges.

No suggestion of any purported incompetence, inability to understand, or involuntariness emerged until after the Court had sentenced Tankson to an eight-year

prison term and had given him a date to report to prison. Even then, the claim of a mental impairment surfaced only just before Tankson's deadline to report to prison—also an event that, by itself, commonly induces a significant degree of anxiety.

The Court turns last to the evidence that Tankson has submitted in connection with his section 2255 motion. None of this evidence persuasively shows that Tankson was incompetent at the time of his guilty plea or that he pled guilty anything less than voluntarily and with a full understanding of the consequences of what he was doing.

The Court begins with the records relating to Tankson's admission to the hospital, which are indicative that, even then, he had the ability to understand and make rational decisions. Hartgrove Hospital itself apparently believed Tankson was competent when it accepted his consent form, in which he stated, "I, Jonathan Tankson, [ ] can legally consent to all assessment evaluation for myself." Case No. 1:14-cr-16, dkt. 216-1. In addition, an emergency services counselor certified that Tankson had the ability to knowingly consent to the terms in the form, stating, "I certify that [Tankson] has been examined and is considered clinically suitable for voluntary admission." *Id.* at 4.

The second item of evidence is the report by Dr. Rowe, who supervised the examination of Tankson by Roni Kholomyansky, M.A., a psychology extern at Hartgrove Hospital. Dr. Rowe's report comes nowhere near suggesting that Tankson's ability to reason was impaired. *See* Case No. 1:14-cr-16, dkt. 240-1. It reflects that Tankson admitted himself to the hospital "due to in ability to cope with increasingly strong feelings of stress, frequent self-isolation, and 'self-medicating with syrup and alcohol,'" as well as increasing irritability and explosive outbursts directed at his family. *Id.* at 2. But the report identified no problems with Tankson's comprehension or communication.

14

To the contrary, the report reflects that Tankson "was appropriately engaged throughout testing," "appeared to put forth adequate effort and answer questions thoughtfully," "did not appear to have any difficulties with task comprehension," and "[h]is thought processes appeared logical and his thought content was appropriate to the questions that were asked of him." *Id*. at 4. Though the report indicates that Tankson exhibited some paranoid ideation, this appeared to be focused on a fear that others might turn on him. *Id.* at 6. Dr. Rowe did not diagnose Tankson as suffering from any form of psychosis or thought disorder; rather, the diagnosis was PTSD and "major depressive disorder, recurrent, moderate, and with anxious distress." *Id.* at 7. Nothing in this report suggests, let alone establishes, incompetence at the time of the plea or an inability to understand or make a rational and intelligent decision to plead guilty.

The third item from the Hartgrove Hospital admission is the report by psychiatrist Dr. Adeoye, which essentially serves as the sole basis for Tankson's claim that he pled guilty involuntarily. First of all, Dr. Adeoye's treatment decisions do not support the proposition that Tankson's competency or his ability to act rationally was or is in doubt. When Dr. Adeoye first saw Tankson, he prescribed medication for anxiety and depression, not for psychosis or bipolar disorder—conditions that he wanted to and ultimately did rule out. Moreover, Dr. Adeoye did not refer Tankson for cognitive testing, which indicates that he was not concerned about Tankson's cognitive abilities. And he discharged Tankson only four days after he was admitted to Hartgrove Hospital without requiring Tankson to have a guardian.

As far as Dr. Adeoye's February 26, 2017 letter is concerned, it does not support the weight that Tankson seeks to place on it. The letter is conclusory on the key

15

relevant points, and it is premised on unsupported and unsubstantiated premises. Dr. Adeoye writes that "[Tankson's] confirmed diagnoses of PTSD and [major depressive disorder] . . . coupled with his limited educational and legal awareness would have created an amalgamation of poor choices during his arrest" such that "[h]e could not have knowingly or voluntarily make [sic] ration [sic] decisions." Case No. 1:17-cv-1732, dkt. 8 at 2. But Tankson's arrest occurred over two years before his guilty plea, which is the relevant event here. And that aside, Dr. Adeoye never tested Tankson to assess his "educational and legal awareness." Indeed, neither Dr. Adeoye nor anyone under his direction conducted any cognitive testing at all. Finally, Dr. Adeoye's concluding statement—that Tankson's ability to make rational decisions "would have been greatly compromised and diminished," *id.*, falls far short of an opinion that Tankson lacked the ability to make an intelligent decision to plead guilty. Perhaps more importantly, this conclusory statement is insufficient to undermine Tankson's express admissions under oath regarding his competence and the voluntary and intelligent nature of his guilty plea or the Court's finding that he was competent and pled guilty voluntarily with full knowledge of the consequences.

The Court adds one final note. As indicated earlier, Tankson's motion does not include a claim of ineffective assistance of counsel for failing to request a competency hearing, argue his incompetence or the involuntariness of the plea, or failing to appeal on these grounds. Tankson's attorneys are the same attorneys who represented him at the time of his guilty plea, and they cannot appropriately argue their own ineffectiveness. *See, e.g., United States v. Adams*, 746 F.3d 734, 739 (7th Cir. 2014). But the Court notes that there is no basis in the record or otherwise to so much as hint

that anything came to defense counsels' attention prior to Tankson's guilty plea or sentencing that would have alerted them to the need to raise any issues along these lines. Thus the Court can find no viable basis for an ineffective assistance claim even if one had been advanced.

**Conclusion**

For the foregoing reasons, the Court denies Jonathan Tankson's section 2255 motion [dkt. #1] and also denies his motion for release from custody [dkt. #5]. The Clerk is directed to enter judgment dismissing Tankson's motion under 28 U.S.C. § 2255. The Court also declines to issue a certificate of appealability, because the disposition of Tankson's motion is not fairly debatable.

```
                                    _____
                                           MATTHEW F. KENNELLY
                                           United States District Judge
```

Date: June 15, 2017